Filed 10/8/21  P. v. Burton CA2/4
Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B293825 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA068747) |
| v. | |
| CEDRIC CARL BURTON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Charles A. Chung, Judge.  Affirmed.

Randy S. Kravis, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Jaime L. Fuster and

Joseph P. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## INTRODUCTION

Appellant Cedric Burton was convicted of murdering Brandy Houston by means of lying in wait. At trial, the only disputed issue was appellant's identity as Houston's killer, who had been captured on video waiting at the sidelines of a fistfight before approaching Houston, drawing a concealed gun from his hoodie, and repeatedly shooting. Houston's murder was witnessed by his nephew Dyjahn and his sisters Lakeisha and Chrishonda. Lakeisha identified appellant as the shooter in court, and Dyjahn identified appellant as the shooter in a photographic six-pack, which was admitted into evidence after Dyjahn claimed at trial to be unable to identify the shooter. The trial court allowed the prosecution to introduce evidence that an unknown party had created a social media page describing Dyjahn as a snitch, with reference to a date on which he and his mother Chrishonda were scheduled to testify. Chrishonda, who testified that this page frightened her, failed to identify anyone as the shooter.

One of the shooter's accomplices, Denelle Wilson, identified the shooter as "Daredevil," an Atlantic Drive Compton Crips member with devil horns tattooed on his forehead. Appellant, who operates a social media account under the name "TG Dirty Devil," has devil horns tattooed

2

on his forehead and the initials of the Atlantic Drive Compton Crips tattooed on his forearm. Wilson mentioned that his sister had heard from an unidentified girl that a man with a devil-horns tattoo had killed someone. He further mentioned that Randy Sullivan (another accomplice) had told him in 2012 that Daredevil had recently been released from a prison sentence on a murder charge. Before trial, over defense counsel's objection on unspecified grounds, the court granted the prosecution permission to introduce evidence that appellant had been charged in 2003 with attempted murder and assault with a firearm, had pleaded guilty to the firearm-assault charge, and had been sentenced to four years in prison. The parties so stipulated. They further stipulated that Sullivan was an unavailable witness, allowing the jury to hear his preliminary hearing testimony confirming that he had written to the court that the shooter had been arrested on the date of appellant's arrest.

Appellant neither testified nor presented evidence. In closing argument, his counsel effectively conceded that the prosecution had proved he was present at the scene of the shooting, but argued that the identifications of appellant as the shooter were unreliable. The court instructed the jury, per CALJIC No. 2.92, that an eyewitness's degree of certainty in making an identification is one of 11 non-exhaustive factors relevant to the identification's reliability. The jury convicted appellant of Houston's murder and found true the allegation that the murder had been committed by means of lying in wait.

On appeal, appellant contends: (1) no substantial evidence supported the jury's true finding on the lying-in-wait special circumstance allegation; (2) the trial court prejudicially erred in admitting evidence of the social media page describing Dyjahn as a snitch; (3) the court prejudicially erred in admitting Wilson's secondhand description of Daredevil's criminal history, along with appellant's own prior conviction and sentence (or his trial counsel was ineffective for failing to properly object to this evidence); (4) his counsel was ineffective for failing to properly object to Wilson's secondhand report of an unidentified girl's statement that a man with a devil-horns tattoo had killed someone; (5) the court violated his due process rights by instructing the jury that the certainty of an eyewitness identification is relevant to its reliability; and (6) he was prejudiced by the cumulative effect of the asserted errors.

In an initial opinion affirming the judgment, we concluded: (1) substantial evidence supported the lying-in-wait special circumstance finding; (2) each of appellant's evidentiary challenges is without merit or forfeited; (3) the asserted deficiencies of appellant's trial counsel were not prejudicial; and (4) the jury instruction on eyewitness certainty did not violate appellant's due process rights. In rejecting appellant's due process challenge to the eyewitness-certainty instruction, we considered ourselves bound by our Supreme Court's approval of CALJIC No. 2.92's certainty factor in *People v. Sánchez* (2016) 63 Cal.4th 411. We noted

4

that the Supreme Court was then reconsidering the due process implications of the certainty factor in *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*).

After we issued our opinion, the Supreme Court granted review and deferred further action pending its decision in *Lemcke*. In May 2021, the court issued its decision in *Lemcke*, holding that on the record before it, the inclusion of the certainty factor in the jury instructions had not violated the defendant's due process rights. (*Lemcke, supra*, 11 Cal.5th at 654-661.) Nevertheless, the court exercised its supervisory powers to direct trial courts to omit the certainty factor from CALCRIM No. 315 (which it deemed materially identical to CALJIC No. 2.92), unless the defendant requests otherwise, pending reevaluation of the factor by the Judicial Council. (*Id.* at 647-648, 656, fn. 6, 668-669.) The court subsequently transferred this matter to us, with directions to vacate our prior opinion and reconsider the cause in light of *Lemcke*. The parties filed supplemental briefs. In appellant's, he concedes that his due process claim appears to lack merit under *Lemcke*.

As discussed below, we agree that appellant's due process claim fails under *Lemcke* and thus adhere to our conclusion that his due process rights were not violated by the inclusion of the certainty factor in CALJIC No. 2.92. Accordingly, we affirm the judgment.

5

# PROCEEDINGS BELOW

## A. *Prosecution Case*

The state charged appellant with Houston's murder (Pen. Code, § 187, subd. (a); count one) and with six counts of being a felon in possession of a firearm (*id.*, § 29800, subd. (a)(1); counts two through seven). It alleged that appellant committed the murder by means of lying in wait (*id.*, § 190.2, subd. (a)(15)) for the benefit of, at the direction of, and in association with a criminal street gang (*id.*, § 186.22, subd. (b)). It further alleged, for sentencing purposes, that appellant had been convicted in February 2004 of assault with a firearm (*id.*, § 245, subd. (a)(2)).

After a first trial, held in April 2018, ended in a mistrial, appellant was retried in September 2018.

### 1. *The Shooting*

The prosecution called Houston's nephew Dyjahn (14 years old at the time of the shooting) and two of Houston's sisters, Lakeisha and Chrishonda. Houston's relatives testified to the following sequence of events on the day of the shooting (November 29, 2012): They attended a gathering at Houston's mother's apartment, along with Houston and his girlfriend. Houston argued with his girlfriend, who called her sister to ask for a ride elsewhere. The sister evidently passed this request along to her boyfriend Terrell Henderson, who arrived at the apartment with his brother Randy Sullivan and his cousin Joshua Lockett. These three men argued with Houston and Dyjahn. Sullivan referenced the

Southside Compton Crips, a gang, and Chrishonda retorted that she knew people from a rival gang. Henderson, Sullivan, and Lockett eventually left, saying they would be back.

Houston and Dyjahn then went to a liquor store down the street, followed soon thereafter by Lakeisha and Chrishonda. The sisters met Houston and Dyjahn (accompanied by some friends) in front of an apartment complex across the street from the liquor store. Henderson, Sullivan, and Lockett reappeared at the complex's gate, accompanied by two other men. A member of this group challenged Houston's group to a fight, and a fistfight broke out.

Cell phone video captured by bystanders (played for the jury and admitted into evidence) showed the fistfight in progress. A man in a black hoodie emerged from the sidelines and walked toward Houston, passing the combatants. When near Houston, he pulled a gun from his hoodie and repeatedly shot Houston. Houston sustained 12 gunshot wounds, three of which were fatal.

### 2. *Lakeisha's In-Court Identification*

Lakeisha identified appellant as the shooter at trial. She testified that she did not participate in the fistfight, instead watching it from about 16 feet away. Houston "was basically like in the midst of everyone's fight," but appellant was not. As the fight was in progress, appellant remained at the gate through which he and his companions had come,

and "never moved really from where the gate was at." He was wearing a hoodie and a face covering (from the nose down). Eventually, Lakeisha heard a gunshot and looked up to see appellant approaching Houston and repeatedly shooting him.

The parties stipulated that a detective was deemed to have testified that Lakeisha was taken to view Henderson, Sullivan, and Lockett on the day of the shooting; that she initially said she believed Lockett was the shooter; and that upon taking a closer look at Lockett and recalling the incident, she said that he, Henderson, and Sullivan were all present at the shooting but none was the shooter.

### 3. *Dyjahn's Six-Pack Identification*

Dyjahn made no in-court identification of appellant -- or anyone else -- as the shooter. He confirmed that Henderson, Sullivan, and Lockett reappeared near the liquor store with additional companions, and testified, "A fist fight broke out and the next thing you know you hear gunshots." Though he initially claimed not to remember seeing a man in a black hoodie, he later testified that he saw such a man shooting Houston. He claimed on cross-examination that he did not see the shooting because he was fighting.

Dyjahn confirmed that on the day of the shooting, the police took him somewhere to view some men, and he told the police that those men had been present at the fight, but none of them was the shooter. He further confirmed that the police later showed him photographic six-packs on two

8

occasions. On the first occasion, he made no identification. On the second, he identified appellant as the shooter.[1]

The parties stipulated that a detective was deemed to have testified that during an interview several months after the shooting, Dyjahn said that he had seen Lockett holding a gun before and after the shooting, but that neither Lockett, Henderson, nor Sullivan was the shooter.

## 4. *Chrishonda's Fear of Testifying*

Chrishonda testified that she did not want to testify, and that she was scared. She explained she had seen a social media page that used a photograph of her son Dyjahn alongside the name "snitch Dayday" (Dayday was Dyjahn's nickname). The creator of this page had posted a comment welcoming readers to see Dyjahn "snitch" in court on a specified date -- the same date on which Dyjahn and Chrishonda were scheduled to testify in appellant's first trial. The trial court overruled a hearsay objection to this testimony, explaining that the testimony was offered to prove Chrishonda's fear, which was relevant to her credibility. Chrishonda testified that she feared for Dyjahn's life as a result of the social media page.[2]

---

[1]     At trial, Dyjahn claimed not to remember whether he had made an identification in the second six-pack. An audio recording of Dyjahn's six-pack identification was played for the jury, and the six-pack was admitted into evidence.

[2]     Unlike his mother, Dyjahn claimed he was "[n]ot at all" afraid to testify.

Chrishonda did not identify appellant -- or anyone else -- as the shooter. She participated in the fistfight, but did not see the shooter doing so, even though he had come through the gate with Henderson, Sullivan, and Lockett. She fell down during the fight, and as a woman helped her up, she saw the shooter -- a Black man wearing a black hoodie, light pants, and a yellow-black face covering -- shoot Houston "many" times. She did not see the shooter's face. On the day of the shooting, she told police that neither Henderson, Sullivan, nor Lockett was the shooter.

### 5. *Sullivan's Letter Regarding the Shooter's Arrest*

Henderson, Sullivan, and Lockett were all convicted of Houston's murder, on an aiding and abetting theory, in a prior trial. At appellant's trial, Henderson and Lockett refused to testify, and the parties stipulated that Sullivan would have refused if called, rendering Sullivan an unavailable witness. The court instructed the jury to consider Sullivan's preliminary hearing testimony, which was read into the record by the prosecutor, as if it had been delivered at trial.

In his preliminary hearing testimony, Sullivan confirmed that in a June 2, 2016 letter to the court, he had written, "It was brought to my family's attention that the actual shooter in my case was arrested on 5/26/16." Appellant was arrested on that date. Sullivan testified that he did not know whether the person arrested was actually

10

the shooter, and that he did not recognize appellant. He also denied that he had ever been a member of the Southside Compton Crips, despite confirming that he had the gang's initials tattooed on his knuckles.

### 6. *Wilson's Identification of Daredevil*

Denelle Wilson testified that on the day of the shooting, he received a call from Henderson (his girlfriend Shamita Cartwright's brother) and agreed to provide Henderson backup in a fistfight. Henderson, Sullivan, and Lockett picked him up, and then proceeded to pick up a friend of Sullivan's, whom Sullivan addressed as "Daredevil."[3] Daredevil was wearing a black hoodie, a yellow shirt, and gray pants. Wilson claimed he was unable to see Daredevil's face or determine Daredevil's race or gender. He denied recognizing appellant, except as someone he had seen in court on previous occasions. Admitting he was afraid Daredevil might hurt his family, he testified that he would not identify Daredevil in court even if Daredevil were present.

The five men drove to the scene of the shooting and approached Houston's group through the gate of an apartment complex. "A fight broke out. Everyone started fighting and a scuffle got big and everything, and shots rang

---

[3] The parties stipulated that a detective was deemed to have testified that appellant operated a social media account under the name "TG Dirty Devil."

11

out and everyone ran and went back to the car." The five men went together to Cartwright's home. Wilson claimed he did not see the shooting or who the shooter was.

Audio recordings from two pre-arrest interviews Wilson gave to the police were played for the jury.[4] During the first interview, he identified Daredevil as the shooter. He described Daredevil as a light-skinned Black man with a tattoo of devil horns on his forehead. This description matched appellant.

During the second interview, Wilson was shown a six-pack that included appellant's picture and instructed not to look for tattoos, as the police "maybe Photoshopped them out." He failed to identify any of the men pictured as Daredevil, but indicated that two men other than appellant were the closest matches. He described Daredevil as a member of Sullivan's gang, the Atlantic Drive Compton Crips.[5] In reference to Daredevil, Sullivan had bragged, "'Yeah I got me a little hitter,[6] you feel me, I got me a dude

---

[4] Wilson testified that he had been arrested in connection with the shooting, had "pled out to accessory," and had been sentenced to probation.

[5] The parties stipulated to the admission of photographs that showed appellant had "ADCC" tattooed on his forearm. The prosecution's gang expert testified that the Atlantic Drive Compton Crips were closely associated with the Southside Compton Crips.

[6] The prosecution's gang expert testified that "hitters" are gang members who "have it in them" to shoot someone.

that's on go, on call, whatever, you know what I'm saying? Whenever it's like that, I just call him up, and he gonna do it. And he just came, he just came off a murder. He just came from beating a murder, little murder case and stuff.'" On the day of the shooting, after picking up Wilson, Sullivan called Daredevil twice, to let him know that the men were en route to his home and that they had arrived. En route to the scene of the shooting, Sullivan told Daredevil the group intended to "'fade'" their opponents (a reference to a fistfight, according to Wilson's trial testimony), and Daredevil responded, "'I don't fight.'" Wilson interpreted this as a sign that Daredevil might use a gun rather than his fists, but he was reluctant to believe Daredevil would shoot someone in broad daylight. After the shooting, Sullivan said to Wilson, "'That's one of my hitters . . . . You like that he did him, huh? He got him, huh?'" Sullivan later heard from his sister that an unidentified girl had said, "'It's a guy with devil horns running around here, you know, he just killed some guy. . . . Oh I just seen him at a food drive. . . . [H]e's running around just homeless, he be at churches, you know, accepting food and stuff like that.'" Wilson claimed he wished he knew who Daredevil was, stating, "The way he killed that guy? He'll kill anybody. And I don't want him to come hurt my family members."

### 7. *Appellant's Phone Records*

Los Angeles County Sheriff's Department crime analyst Danielle Hefte, an expert in the analysis of cell

phone records, analyzed records of calls made and received by appellant's phone on the day of the shooting. She explained how such records can be compared to the locations of nearby phone towers to determine the likely general location of the phone at the time a call was made or received. She conceded that such analysis cannot determine the phone's precise location or identify its user.

Hefte created an exhibit relating the data from appellant's phone to three addresses: (1) appellant's home; (2) the scene of the shooting; and (3) Cartwright's home, where Wilson said the shooter and his accomplices went after the shooting. At 12:47 and 12:48 p.m., appellant's phone was near his own home and had two short calls with Sullivan's phone. The shooting occurred about 20 minutes later, around 1:09 p.m. About seven minutes later (at 1:16 p.m.), Sullivan's phone called appellant's while moving toward Cartwright's home, but the call lasted zero seconds, suggesting it was placed inadvertently. Between 1:20 and 1:34 p.m., appellant's phone was near Cartwright's home and made or received a total of eight calls. At 1:51 and 1:53 p.m., appellant's phone made calls from near his own home.

### 8. *Appellant's Prior Conviction*

Prior to appellant's first trial, the prosecution filed a motion in limine for permission to introduce evidence of appellant's 2004 conviction for assault with a firearm and his attendant prison sentence. The prosecution argued this evidence was admissible to link appellant to Wilson's

14

secondhand report that in 2012, Daredevil (the shooter) "had just gotten out of prison for shooting someone."  Appellant's counsel objected to admission of this evidence, but failed to specify any ground for his objection, instead merely arguing that Wilson had never identified appellant as Daredevil and that Daredevil had reportedly murdered someone, rather than merely assaulting someone.  The trial court ruled the conviction and sentence admissible, explaining, "[Wilson] says that the defendant, or the shooter, was someone who had just gotten out for murder.  The actual facts are [appellant] had just gotten out of prison for [assault with a firearm].  There is some discrepancy there.  But, if anything, it helps the defense.  So the defense can say, look, there is a big difference between murder and assault with a firearm.  And on top of that, the fact that he was released for assault with a firearm versus murder makes it less prejudicial."  Appellant's counsel pointed out another discrepancy: Sullivan reportedly had said, in 2012, that Daredevil had "just" been released from prison, but appellant had been released from prison years before 2012.  The court responded that this discrepancy "goes to weight and not admissibility . . . ."

During appellant's second trial, the parties did not relitigate the admissibility of the prior conviction on the record, but evidently discussed it with the court in camera.  The parties stipulated that appellant was charged with attempted murder and assault with a firearm in 2003, that

he pleaded guilty to assault with a firearm, and that he was sentenced to four years in prison.

## B. *Defense Case*

Appellant neither testified nor presented evidence.

## C. *Jury Instructions and Closing Arguments*

The court instructed the jury, per CALJIC No. 2.92, that in determining the weight to be given eyewitness identification testimony, the jury should consider factors bearing upon the identification's accuracy. The court provided a non-exhaustive list of 11 such factors, including "[t]he extent to which the witness is either certain or uncertain of the identification[.]" The court further instructed the jury that a witness's "[i]nnocent misrecollection is not uncommon," and that the jurors were the "sole judges of the believability of a witness and the weight to be given the testimony of each witness." Finally, the court instructed the jury that appellant was presumed to be innocent, and that the People bore the burden of proving his identity as the perpetrator (as well as his guilt of the charged offenses) beyond a reasonable doubt.[7]

---

[7] The court did not deliver any limiting instruction regarding appellant's firearm-assault conviction. On inquiry from the court, appellant's counsel confirmed he had made a tactical decision not to request such an instruction, to avoid highlighting the prior conviction for the jury.

16

In closing argument, the prosecutor argued Houston was murdered by means of lying in wait, as the video showed the shooter waited on the sidelines until the fight had distracted Houston, then approached Houston while concealing his gun inside his hoodie, before launching his sudden, close-range attack.  He argued appellant was the shooter, relying on Dyjahn's six-pack identification, Lakeisha's in-court identification, Sullivan's letter identifying the date of appellant's arrest as the date the shooter was arrested, and Wilson's identification of Daredevil as the shooter.  The prosecutor argued appellant was Daredevil, pointing out that his devil-horns tattoo and general appearance matched Wilson's description of Daredevil, that he had an additional tattoo of the initials of the gang to which Daredevil reportedly belonged, that he used the name "T.G. Dirty Devil" for a social media account, that his prior firearm-assault conviction was similar to Daredevil's reported prior conviction, and that his phone records showed:  (1) he received calls from Sullivan around the time Sullivan reportedly called Daredevil when picking him up; and (2) shortly after the shooting, he made several calls near Cartwright's home, where Daredevil reportedly accompanied his accomplices after the shooting.  The prosecutor did not rely on CALJIC No. 2.92's certainty factor.

As appellant acknowledges on appeal, his trial counsel effectively conceded that the prosecution evidence was sufficient to prove appellant was present at the scene of the shooting.  He argued that the evidence nevertheless failed to

17

establish that appellant was the shooter, as Lakeisha's and Dyjahn's identifications of appellant as the shooter were unreliable, and neither Sullivan nor Wilson had identified appellant as the shooter by name.

A second prosecutor delivered the rebuttal. She pointed out defense counsel's apparent concession regarding appellant's presence at the scene of the shooting. She argued this concession and the process of elimination supported an inference that appellant was the shooter, as Lakeisha, Dyjahn, and Chrishonda each had said that neither Henderson, Sullivan, nor Lockett was the shooter, and the only other men confirmed to have been present were Wilson and appellant. She argued that Sullivan and Wilson had not identified appellant by name because they were loyal or afraid, and that each had identified him implicitly.

### D. *Verdict, Sentencing, and Appeal*

The jury convicted appellant of first degree murder and found true the allegation that the murder occurred by means of lying in wait. Appellant pleaded no contest to the felon-in-possession counts and admitted the truth of the gang and prior conviction allegations.

The court sentenced appellant, on the murder count, to life in prison without the possibility of parole. It sentenced appellant to concurrent three-year terms on each of the six felon-in-possession counts. Appellant timely appealed.

18

## DISCUSSION

Appellant contends: (1) no substantial evidence supported the jury's true finding on the lying-in-wait special circumstance allegation; (2) the trial court prejudicially erred in admitting evidence of the social media page describing Dyjahn as a snitch; (3) the court prejudicially erred in admitting Wilson's secondhand description of Daredevil's criminal history, along with appellant's own prior conviction and sentence (or his trial counsel was ineffective for failing to properly object to this evidence); (4) his counsel was ineffective for failing to properly object to Wilson's secondhand report of an unidentified girl's statement that a man with a devil-horns tattoo had killed someone; (5) the court violated his due process rights by instructing the jury that the certainty of an eyewitness identification is relevant to its reliability; and (6) he was prejudiced by the cumulative effect of the asserted errors.

### A. *Sufficiency of Evidence of Lying in Wait*

The lying-in-wait special circumstance has three elements: (1) a concealment of purpose; (2) a substantial period of watching and waiting for an opportune time to act; and (3) a surprise attack on an unsuspecting victim from a position of advantage. (*People v. Woodruff* (2018) 5 Cal.5th 697, 774 (*Woodruff*).) Appellant does not dispute the sufficiency of the evidence that he watched and waited for a substantial period, but he contends there was insufficient evidence that he concealed his purpose or launched a

19

surprise attack on an unsuspecting victim from a position of advantage. We review the record in the light most favorable to the judgment and affirm if it discloses substantial evidence, meaning evidence from which a reasonable jury could find the special circumstance allegation true beyond a reasonable doubt. (*People v. Becerrada* (2017) 2 Cal.5th 1009, 1028-1029.)

### 1. *Concealment of Purpose*

There was substantial evidence that appellant concealed his purpose. The jury reasonably could have found, from the video evidence and the victim's sisters' testimony, that appellant did not join in the fistfight but rather waited some distance away, watching the fistfight as it progressed and Chrishonda fell down. Only then did he pass by the combatants to get closer to Houston. He concealed his gun in his hoodie before launching his sudden, close-range attack. This was sufficient. (See *Woodruff*, *supra*, 5 Cal.5th at 775 [substantial evidence supported lying-in-wait special circumstance finding, where defendant waited some distance from scene where victims were arresting defendant's mother and brother, and concealed his gun behind his back while waiting]; *People v. Mendoza* (2011) 52 Cal.4th 1056, 1074 (*Mendoza*) [same, where defendant waited some distance from scene where victim was pat-searching defendant's companion, and concealed his gun while waiting and then maneuvering closer to victim].)

20

Contrary to appellant's contention, this element does not require evidence that the defendant either hid himself or executed a ruse. (See *Woodruff, supra*, 5 Cal.5th at 775 [defendant neither executed ruse nor hid his location, and in fact "warned the [victims] from that location to leave his mother alone"].) Appellant identifies no authority for this purported requirement, instead relying on caselaw finding substantial evidence of lying in wait on different facts than those presented here. In *Mendoza*, our Supreme Court rejected an argument similar to appellant's: "[D]efendant asserts his actions were not of the same character as those found to constitute lying in wait in other cases, e.g., he did not wait for a victim to arrive at a chosen location, or follow or lure a victim to a particular spot, or murder a victim in his sleep. No matter. Because each case necessarily depends on its own facts, and because defendant's conduct clearly satisfied each of the lying-in-wait requirements, the attempt to contrast this case with others falls short." (*Mendoza, supra*, 52 Cal.4th at 1075.) Here, likewise, appellant's conduct satisfied the concealment-of-purpose requirement, and he cannot establish otherwise merely by contrasting this case with others.

### 2. *Surprise Attack on Unsuspecting Victim from Position of Advantage*

There was substantial evidence that appellant launched a surprise attack on Houston, an unsuspecting victim, from a position of advantage. The jury reasonably

could have found that Houston, seeing appellant waiting by the gate where he and his companions had first appeared, viewed appellant as a noncombatant, and that Houston's attention was diverted from appellant by the fistfight. (See *Woodruff*, *supra*, 5 Cal.5th at 775 [at time of attack, officers were occupied with arrest of defendant's mother and brother and "could not have known that defendant had armed himself and was considering shooting at them"].) Further, the jury reasonably could have found that Houston failed to suspect that the fistfight -- occurring in broad daylight and within full view of bystanders who captured part of it on video -- would escalate into a shooting, particularly at the hands of a man detached from the fray. (Cf. *People v. Streeter* (2012) 54 Cal.4th 205, 249 (*Streeter*) [substantial evidence supported finding defendant launched fatal surprise attack on former victim of his domestic abuse; "because it appeared that the prior domestic assaults on [victim] occurred within the privacy of their home, the jury could reasonably infer that she could not have anticipated that defendant would beat her in public and certainly not set her on fire there"].) Indeed, Wilson indicated to police that he had been surprised when Daredevil hinted, en route to the fight, that he might shoot one of their opponents in broad daylight. Houston's failure to anticipate the fatal attack allowed appellant to launch it from an advantageous position near his distracted victim.

Contrary to appellant's contention, the jury was not compelled to find that Houston anticipated the fatal attack

because he had seen appellant arrive with companions "who had shouted the name of a criminal street gang" during their earlier argument with Houston. It is true that Houston had reason to suspect appellant shared his companions' hostile purpose. But our Supreme Court has found the surprise-attack element supported by substantial evidence even where the victim, having reason to suspect aggression from the defendant, took precautions prior to the attack. (See *Woodruff, supra*, 5 Cal.5th at 711-712, 775 [substantial evidence supported finding defendant launched surprise attack on two police officers arresting his mother and brother, even though defendant and his brother had warned first officer to leave their mother alone, prompting first officer, "[f]eeling unsafe," to call second for backup]; *Mendoza, supra*, 52 Cal.4th at 1074 & fn. 8 [substantial evidence supported finding defendant launched surprise attack on police officer pat-searching his companion, even though defendant had "rudely challenged" officer at outset of encounter, and officer had "decided to take precautionary action" by conducting pat-search after directing defendant and another companion to sit some distance away]; *Streeter, supra*, 54 Cal.4th at 211-212, 248-249 [substantial evidence supported finding defendant launched surprise attack on ex-girlfriend, even though she had separated from him due to physical abuse and, en route to fatal meeting with defendant, was "nervous" and brought son "to protect her"].) Here, the jury reasonably could have found that Houston inferred, from appellant's waiting at the gate, that appellant

23

intended to assist his companions' hostile purpose only as a lookout or as backup. In that case, he could not have anticipated that appellant would interrupt the fistfight by shooting him dead.

### B. *Evidentiary Challenges*
#### 1. *Witness Intimidation*

Appellant contends the trial court prejudicially erred in admitting evidence of a social media page describing Dyjahn as a snitch, notwithstanding appellant's concession that Chrishonda (Dyjahn's mother and the victim's sister) was afraid to testify as a result of the page. He argues evidence of a witness's fear of testifying is relevant only if there is other evidence "suggest[ing] that the witness's credibility has been affected" by that fear, such as evasive or equivocal responses to questions.

The trial court acted within its discretion in admitting the evidence that Chrishonda was afraid to testify as a result of the social media page, as the evidence was relevant to her credibility. (See *People v. Sandoval* (2015) 62 Cal.4th 394, 429-430 ["'Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and therefore is admissible. [Citations.] An explanation of the basis for the witness's fear is likewise relevant to her credibility and is well within the discretion of the trial court'"].) Our Supreme Court has rejected appellant's proposed foundation requirement by holding that the relevance of such evidence is independent of any showing

24

that the witness's testimony was "inconsistent with prior statements or otherwise suspect." (*People v. Valdez* (2012) 55 Cal.4th 82, 135-136.) The court expressly disapproved *People v. Yeats* (1984) 150 Cal.App.3d 983 -- the principal authority on which appellant relies -- to the extent it announced a contrary rule. (*People v. Valdez*, *supra*, at 136, fn. 33.)

### 2. *Appellant's and Daredevil's Criminal History*

Appellant contends Sullivan's description of Daredevil's criminal history (as reported by Wilson) should have been excluded under: (1) the hearsay rule, which generally prohibits admission of an out-of-court statement offered to prove the statement's truth (Evid. Code, § 1200, subds. (a)-(b)); or (2) Evidence Code section 352 (Section 352), which grants the trial court discretion to exclude evidence if its probative value is substantially outweighed by the probability that its admission will, inter alia, create substantial danger of undue prejudice. Appellant further contends his 2004 firearm-assault conviction and attendant sentence should have been excluded because: (1) they were irrelevant in the absence of evidence concerning Daredevil's conviction and sentence, which should have been excluded; and (2) their probative value was substantially outweighed by the risk of unfair prejudice.

Respondent contends appellant forfeited his evidentiary challenges by failing to object on hearsay or

25

Section 352 grounds in the trial court. We agree. (See *People v. Perez* (2020) 9 Cal.5th 1, 7 ["Ordinarily, 'the failure to object to the admission of . . . hearsay at trial forfeits an appellate claim that such evidence was improperly admitted'"]; *People v. Jones* (2012) 54 Cal.4th 1, 61 [defendant forfeited contention that expert opinion should have been excluded under Section 352, where defendant failed to make "this specific objection" at trial, instead merely objecting that expert was unqualified to render opinion].) Appellant's counsel did not object to Wilson's reporting of Sullivan's statement. Though appellant's counsel objected, during appellant's first trial, to admission of the firearm-assault conviction and sentence, he neither specified the grounds for his objection nor argued the evidence's probative value was substantially outweighed by any consideration set forth in Section 352. (See California Guide to Criminal Evidence (2020 ed.) ch. 6, § 4 ["To make a proper objection under Evid. C. § 352, the party must specify the precise ground for the objection (i.e., time-consuming, unduly prejudicial, confusing, or misleading)"].) Thus, appellant forfeited his hearsay and Section 352 challenges to Sullivan's description of Daredevil's criminal history, along with his Section 352 challenge to the admission of his prior conviction and sentence.

### C. *Ineffective Assistance of Counsel*

Appellant contends his trial counsel was unconstitutionally ineffective in failing to: (1) preserve

appellant's hearsay and Section 352 challenges to the evidence of his and Daredevil's criminal history; and (2) raise a hearsay objection to Wilson's statement that his sister had heard from an unidentified girl that a man with a devil-horns tattoo had killed someone. To prevail on this contention, appellant must prove ""'that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that counsel's deficient performance was prejudicial, i.e., that a reasonable probability exists that, but for counsel's failings, the result would have been more favorable to the defendant.'"" (*In re Crew* (2011) 52 Cal.4th 126, 150.) "If a claim of ineffective assistance of counsel can be determined on the ground of lack of prejudice, a court need not decide whether counsel's performance was deficient." (*Ibid.*)

Without deciding whether trial counsel's performance was deficient, we reject appellant's ineffective assistance claim on the ground that his counsel's asserted failings were not prejudicial. Appellant's counsel effectively conceded, during closing argument, that the prosecution evidence was sufficient to prove that appellant was present at the scene of Houston's shooting. Lakeisha, Dyjahn, and Chrishonda each said that neither Henderson, Sullivan, nor Lockett was the shooter, and the only other men confirmed to have been present were Wilson and appellant. Four eyewitnesses identified appellant as the shooter. First, Lakeisha identified appellant as the shooter in court. Second, Dyjahn identified appellant as the shooter in a six-pack (and did not

27

recant that identification at trial, instead merely failing to make any identification -- perhaps influenced by the anonymous social media page labeling him a snitch). Third, Sullivan implicitly identified appellant as the shooter by writing to the court that the shooter had been arrested on the date of appellant's arrest. Finally, though Wilson identified "Daredevil" rather than appellant as the shooter, there was overwhelming evidence that appellant was Daredevil, including: (1) appellant's "TG Dirty Devil" social media account; (2) his forearm tattoo indicating he belonged to the gang to which Daredevil reportedly belonged; (3) phone records suggesting that he received calls from Sullivan around the time Sullivan reportedly called Daredevil when picking him up, and that he made several calls near Cartwright's home around the time Daredevil reportedly was there after the shooting; and (4) the similarity between his appearance and Wilson's description of Daredevil -- most strikingly, their matching devil-horns tattoos. During closing argument, the prosecutors referenced appellant's prior conviction only in passing, as one example among many of evidence that appellant was Daredevil. They made no mention of the unidentified girl's reported statement. We are confident that the jury would have convicted appellant even had his trial counsel successfully objected to the admission of his prior conviction and the unidentified girl's statement. (See *In re Crew*, *supra*, 52 Cal.4th at 150 [""A reasonable probability [of a more favorable result absent counsel's failings] is a probability

28

sufficient to undermine confidence in the outcome"'"'"'].) Accordingly, counsel's failure to raise such objections did not render his assistance unconstitutionally ineffective.

### D. *Instruction on Eyewitness Certainty*

Appellant initially contended the trial court violated his due process rights by instructing the jury, per CALJIC No. 2.92, that an eyewitness's degree of certainty in making an identification is one of 11 non-exhaustive factors relevant to the identification's reliability. Following the issuance of *Lemcke,* he acknowledges that the case "appears [to have] invalidated his claim that the trial court's inclusion of the witness-certainty factor in its version of CAL[JIC] 2.92 violated his right to due process . . . ." While suggesting that *Lemcke* supports a finding of some other, unspecified type of error, no such error was asserted in appellant's initial briefing or considered in *Lemcke.* (See *Lemcke, supra,* 11 Cal.5th at 653-654 & fn. 3 [due process was sole issue adequately raised for review].) Accordingly, we need address only appellant's due process claim. As explained below, we conclude the claim fails.[8]

---

[8]     In their initial brief, the People did not raise the issue of forfeiture, instead conceding we could consider the merits of appellant's due process claim "even though defense counsel did not object to the instruction as given." We need not consider the People's belated raising of the forfeiture issue in their supplemental brief. In any event, we conclude the due process claim fails on the merits.

"A jury instruction may "'so infuse[] the trial with unfairness as to deny due process of law."' [Citation.] However, "'not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation. The question is "'whether the ailing instruction . . . so infected the entire trial that the resulting conviction violates due process."'" [Citation.] "'It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record."'" (*Lemcke, supra*, 11 Cal.5th at 655.)

In *Lemcke*, the prosecution case rested on a single eyewitness, who identified the defendant as the perpetrator on three occasions: twice when shown photographic lineups before trial, and finally at trial. (*Lemcke, supra*, 11 Cal.5th at 648-650.) The eyewitness expressed certainty in her identification.[9] (*Id.* at 649-650.) The defendant challenged the identification's accuracy, both by calling an expert to testify about, inter alia, the weak correlation between certainty and accuracy, and by cross-examining the eyewitness and the investigating officers who had shown her the photographic lineups. (*Id.* at 650-652, 660.) In language essentially identical to CALCRIM No. 315, the trial court

---

[9]    Before trial, the eyewitness pointed to the defendant's photograph and said, "'[F]or sure it was [him].'" (*Lemcke, supra*, 11 Cal.5th at 649.) At trial, she testified that she remembered the defendant's face well and it was "'impossible for [her] not to recognize his face.'" (*Id.* at 649-650.)

instructed the jury on 15 factors it should consider in evaluating the accuracy of an eyewitness identification, including how certain the witness was when she made the identification. (*Id.* at 652, 654, fn. 5.) In closing argument, the prosecution focused on the eyewitness's testimony, arguing her consistent identification of the defendant was accurate, in part because she was "'certain the entire time.'" (*Ibid.*) The jury convicted the defendant, and the Court of Appeal affirmed, concluding it was bound by *People v. Sánchez, supra*, 63 Cal.4th 411, to reject the defendant's due process challenge to the certainty factor. (*Id.* at 653.) The defendant renewed this challenge in the Supreme Court, arguing that the certainty factor had violated his due process rights by (1) lowering the prosecution's burden of proof, and (2) denying the defendant a meaningful opportunity to present a complete defense on the issue of identity. (*Id.* at 657.)

Rejecting both arguments, the Supreme Court found no merit in the due process claim. (*Lemcke, supra*, 11 Cal.5th at 654-661.) Concerning the burden of proof, the court observed, "The instruction leaves the jury to decide whether the witness expressed a credible claim of certainty and what weight, if any, should be placed on that certainty in relation to the numerous other factors listed . . . ." (*Id.* at 657.) The court further observed that the jury had been instructed that (1) the jurors were responsible for judging the credibility of witnesses, who sometimes make honest mistakes about what they remember; (2) the defendant was presumed innocent;

31

and (3) the prosecution was required to prove the defendant's identity as the perpetrator (as well as the elements of the charges) beyond a reasonable doubt. (*Id.* at 658.) Concerning the defendant's opportunity to present a complete defense, the court observed that the defendant had "had the opportunity to cross-examine [the eyewitness] and the investigating officers regarding her identifications and the procedures used during the photographic lineups," and had "elicited numerous inconsistencies in other aspects of [her] recollection . . . ." (*Id.* at 660.) The court concluded that the inclusion of the certainty factor in the eyewitness-identification instruction had not rendered the trial fundamentally unfair. (*Id.* at 646, 661.)[10]

Here, guided by *Lemcke*, we conclude that appellant's due process claim lacks merit. None of the eyewitnesses expressed certainty. The jury reasonably might have inferred *uncertainty* from the eyewitnesses' failure to consistently identify appellant as the shooter before and at trial.[11] Thus, the certainty factor did not favor the prosecution. (Cf. *Lemcke*, *supra*, 11 Cal.5th at 666 [certainty

---

[10] The court additionally relied, in part, on the defendant's presentation of expert testimony concerning the certainty factor. (*Lemcke*, *supra*, 11 Cal.5th at 657-660.) Appellant does not claim he was denied an opportunity to present such testimony. Nor does he argue that the absence of such testimony at his trial warrants a different result than in *Lemcke*.

[11] Before trial, Lakeisha first identified Lockett as the shooter. At trial, Dyjahn and Wilson failed to make any identification.

factor "raises particular concerns in a case like this one, where the conviction was based almost entirely on the testimony of a single witness who expressed certainty in her identification"].)  Indeed, the prosecution did not rely on the certainty factor during closing argument.  Finally, appellant had ample opportunity to challenge the accuracy of the identifications through cross-examination and argument, and the jury was properly instructed on its role in evaluating a witness's reliability and the prosecution's burden of proof. (See *id.* at 658, 660.)  We conclude that the inclusion of the certainty factor in CALJIC No. 2.92, considered in the context of the instructions as a whole and the trial record, did not """so infuse[] the trial with unfairness as to deny due process of law.""" (*Id.* at 655.)

### E. *Cumulative Error*

We have rejected appellant's contentions of trial court error and found the asserted failings of his trial counsel not prejudicial.  Accordingly, we reject his contention that he was prejudiced from the cumulative effect of the asserted errors.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.**

MANELLA, P. J.

We concur:

COLLINS, J.

CURREY, J.